# H. B. MOORE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3544.    Promulgated October 10, 1927.

1. Petitioner's net sales, expenses, and amount of taxes paid, determined for the taxable year.

2. Respondent's determination of the amounts of the allowances for depletion and depreciation, approved.

3. The petitioner's distributive share of partnership net income determined in accordance with the findings of fact and conclusions of law made in the appeals of the remaining members of the partnership.

4. The evidence held insufficient to establish a net loss for the year 1919.

5. The action of the respondent in disallowing as a deduction an alleged loss of $3,000 approved for want of evidence.

6. Deductions claimed by reason of bad debts allowed in part and disallowed in part.

*Maynard Teall, Esq.,* for the petitioner.
*A. H. Murray, Esq.,* for the respondent.

In this proceeding the petitioner seeks a redetermination of his income tax for the year 1920, for which the Commissioner has determined a deficiency in the amount of $5,434.87.

The petitioner alleges errors as follows:

(1) The taxpayer erroneously reported $123,695.11 as gross income from the sale of coal, and the Commissioner erroneously determined net sales as $123,695.11. The correct amount is $121,837.39.

(2) The Commissioner erroneously determined the aggregate of items for materials and supplies and other expense for the Ruth Mine to be $10,569.13, whereas the correct aggregate of such items was $13,802.65.

(3) The Commissioner allowed deductions for taxes only in the amount of $515.06, whereas the correct amount was $692.10.

(4) The Commissioner refused to allow as a deduction from gross income the depreciation and depletion sustained by the Ruth Mine property in the year 1920 amounting to $22,224.80.

(5) The Commissioner of Internal Revenue erroneously increased the amount of the taxpayer's income received from the Youghiogheny Coal and Coke Company (in which the taxpayer was a partner) by the disallowance of $4,453.10 paid by the partners for Legal Services and $1,000.00 contributed by the partners to the Salvation Army in the year 1920.

(6) The Commissioner of Internal Revenue refused to allow a deduction of $14,062.33 in 1920, the loss sustained from the operation of the Ruth Mine in 1919; which deduction taxpayer was entitled to in 1920 because his business operated at a loss in 1918.

(7) The Commissioner of Internal Revenue refused to allow as a deduction from gross income the loss of $3,000.00 sustained by the taxpayer through the sale of real estate.

(8) The Commissioner of Internal Revenue refused to allow as a deduction from gross income the amount of $5,800.00 representing monies loaned and found to be uncollectible in the year 1920.

The amended answer of the respondent contains the following allegations:

Alleges that the deficiency letter is in error, in so far as it has allowed a deduction for salaries and wages in the amount of $56,563.17; and alleges further that no amount whatever should have been allowed.

Alleges that the deficiency letter is in error, in so far as it has allowed a deduction for bonuses to employees in the amount of $12,567.73; and alleges further that no amount whatever should have been allowed.

These affirmative allegations of the answer were not controverted by the petitioner in any pleadings. No proof was offered by either party as to the matters therein set forth.

FINDINGS OF FACT.

The petitioner is a resident of Dawson, Pa., and during the year in question was engaged in the mining of coal from what is known as the Ruth mine, which mine is located in the vicinity of Dawson. During the preceding years the petitioner had at times operated this mine under the name of the Parkhill Coal Co. In the year 1913 the petitioner purchased all of the coal in what is known as the Freeport vein underlying a certain tract of land containing 119 acres, together with surface rights sufficient for the operation of the mine, at a total cost of $5,000. Subsequent mining operations disclosed that of the 119 acres only 5.84 acres were underlain by the Freeport vein. Immediately contiguous to the property thus acquired by purchase, there was property in which one Rainey owned the Freeport vein of coal, and, at the time of the purchase by the petitioner, Rainey requested the petitioner to mine out the coal owned by him. The mine purchased by the petitioner had theretofore been developed to a small extent. In 1913 he extended the openings and proceeded to the development of the mine and to the erection of tipple, mine buildings, etc., necessary to the operation thereof. Entries, tunnels, etc., made upon the property owned by the petitioner were continued into the property owned by Rainey, and at a time not disclosed by the record, the petitioner commenced to remove coal therefrom. In 1917 the petitioner procured a lease from Rainey covering the Freeport vein, the consideration of which was the payment of a royalty of 10 cents per ton. So far as the record discloses the petitioner had not paid for the coal removed by him from the Rainey property prior to the execution of the lease.

All of the coal upon the land owned by the petitioner was mined through what is known as Mine No. 1. Not later than 1915, all the

coal having been removed, this mine was abandoned and a new one known as No. 2 opened up some distance away. Facilities other than those within Mine No. 1 were used in connection with Mine No 2. These facilities consisted of the tipple, buildings, etc., above mentioned, and a spur track connecting the mine with the railroad.

The record establishes certain developments, expenditures, and costs, which, for reasons appearing in the opinion, we have not set forth in detail.

The tonnage of coal removed from the Ruth mine was as follows:

| Year: | Tons. | Year: | Tons. |
|---|---|---|---|
| 1913 | (1) | 1919 | 11, 921. 75 |
| 1914 | 1, 693. 75 | 1920 | 20, 381. 81 |
| 1915 | 1, 295. 03 | 1921 | 138. 21 |
| 1916 | 1, 103. 09 | 1922, to and including | |
| 1917 | 6, 853. 05 | October | 6, 283. 41 |
| 1918 | 3, 673. 95 | | |

The coal mined from January 1, 1917, to October, 1922, amounted to 49,252 tons. It is impossible to ascertain from the record at what point of time the petitioner's operations crossed the line between the coal owned in fee and coal acquired under the lease. No estimate can be made as to the amount of coal mined from either source.

For the year 1920, the respondent denied all deductions for royalties, depreciation or depletion. The petitioner's gross sales from the Ruth mine were $124,679.47. All the coal from the Ruth mine was sold to the Youghiogheny Coal & Coke Co., a brokerage firm. The gross sales represent the aggregate credit to the petitioner's accounts on the books of the Youghiogheny Coal & Coke Co. There were charges to the petitioner's account during the year, aggregating $498.65, covering allowances and adjustments made in the prices of coal where disputes arose with purchasers. The books of the Youghiogheny Coal & Coke Co. show further charges of $2,065.46 to the petitioner's account during the period from January 19, 1921, to August 16, 1921, covering similar allowances and adjustments on shipments of coal made in 1920. The petitioner's net sales from the Ruth mine in the year 1920 were $124,180.82.

In the year 1920, the petitioner expended the sum of $11,827.93 for materials and supplies used by him in the Ruth mine. The evidence does not differentiate expenses and capital expense items, and accordingly no allocation of these amounts can be made. The Commissioner has allowed as a deduction the sum of·$10,569.13.

During the year 1920, the petitioner owned a one-third interest in a partnership known as Youghiogheny Coal & Coke Co., coal

---

1 Practically none.

brokers. This partnership was composed of the petitioner, R. D. Henry, and Otto Hass. Beginning with the year 1917, the partnership sold for the petitioner all of the coal mined from the Ruth mine and for such services was paid a commission. In the same year the partnership paid for legal services the sum of $4,453.10 and made a contribution to the Salvation Army in the sum of $1,000. In *Appeal of R. D. Henry*, 3 B. T. A. 72, the deduction of the above amounts was approved by this Board.

The petitioner's returns for the years 1918, 1919, and 1920, were prepared upon the basis of cash receipts and disbursements. For the year 1920, an amended return, upon the accrual basis, was filed. The return for the year 1918 disclosed a loss from the operation of business and profession of $6,641.44. This loss was reduced by other income and increased by other deductions, as set forth in the return, to the sum of $4,093.65. The return for 1918 disclosed a net loss of $1,348.46 resulting principally from a sale in the operation of business in the amount of $1,506.73. Attached to the return for this year is a memorandum of the Commissioner's office, as follows:

(1) Form (E) not requested.

(2) The amount of depletion, if any, would have no bearing on the amount of tax as the taxpayer suffered a loss in this year.

(3) It is recommended that the case be audited and closed for 1918.

This memorandum was signed by a valuation engineer and approved by the chief of the coal valuation section. The memorandum bears the stamp "Approved for audit, November 24, 1922, Head of Natural Resources Division." Attached to the return is a further memorandum from which it appears that no tax is due for the year 1918, upon which there is stamped, "Reviewed October 16, 1923." There is also attached to this return a waiver signed by the petitioner, upon which there is a notation "effective until March 15, 1925."

In 1905 or 1906, the petitioner acquired a residence property at a cost of $6,000, upon which in 1907 he expended the sum of $3,500 in making improvements. The property was sold in 1920 for $4,000.

In the year 1920 the petitioner deposited $800 as margins with a firm of brokers in Uniontown, Pa. In that year the brokerage firm became insolvent and went into bankruptcy and the petitioner's claim against it was wholly worthless.

In the year 1920, the petitioner's nephew was in need of money and the petitioner, either as guarantor or surety, joined with his nephew in the execution of a series of notes aggregating $5,000, the entire proceeds of which went to the nephew. When the notes became due, the nephew was unable to pay and the notes were renewed, the petitioner again signing as guarantor or surety. At the end of the renewal period and before the expiration of the year 1920, the peti-

tioner was compelled to pay the notes. The petitioner's nephew at that time was insolvent and stated that he did not think he would be able to pay the notes.

GREEN: The errors alleged in the petition will be disposed of in the order in which they appeared in the pleadings.

The first allegation of error relates to the amount of the gross income received from the sale of coal. The petitioner's accounts were kept on the basis of receipts and disbursements. All of the coal mined in 1920 from the Ruth mine was sold through the Youghiogheny Coal & Coke Co. The sales for such year amounted to $124,-679.47. During that year the broker paid $498.65 by way of adjustments to the purchasers of this coal and the parties have stipulated that this amount is a proper deduction from gross income. In 1921, in adjusting disputes with customers, the amount of $2,965.46 was paid out on sales which had been consummated in the year 1920. Such latter amount may not be deducted in the year 1920 inasmuch as the petitioner is upon a cash receipts and disbursements basis and the amounts were not paid out for him or by him during such year. The net sales from the Ruth mine amounted to $124,180.82.

The second allegation of error relates to the amount deductible as expense of operating the mine. Inasmuch as there is nothing in the record which enables us to segregate the capital expenditures from the expenses, we approve the determination of the Commissioner in allowing as a deduction on this item the sum of $10,569.13.

The third allegation of error is disposed of by our findings of fact that in the year 1920 the petitioner paid taxes in the sum of $692.10.

The fourth allegation of error relates to the deduction to be allowed for depreciation and depletion. It is clear from the evidence that, in the year in question, the petitioner mined no coal of which he was the owner. We can not determine from the evidence whether the petitioner had a lease prior to March 1, 1913, or the value thereof on that date if such lease was made prior to that date. It is clear that the lease as such cost the petitioner nothing, so that if acquired subsequent to March 1, 1913, there is no capital expenditure to be returned through the depletion allowance and we therefore hold that he is entitled to no deduction for depletion. It is equally clear from the evidence that the petitioner had expended substantial amounts in tracks, buildings, mine equipment and machinery, all of which, of course, are properly the subject of depreciation. The expenditures in this regard were in part made in Mine No. 1, which was wholly abandoned before the taxable year. We are unable to ascertain the amounts of the expenditures which relate only to Mine

No. 1. As relates mining property, there are two common methods of determining how much of the total amount to be recovered through the depreciation allowances shall be allowed in any given year. In one method the physical life of the asset or group of assets to be depreciated is determined and the basis for depreciation divided by the years all live. In the other method the total recoverable tonnage of mineral is ascertained and this amount is divided by the cost or their basis of depreciable property to the end that to each ton is allocated its proper proportion of this cost and the annual deduction obtained by multiplying such factor by the number of tons removed in any given year. The evidence in this case is wholly lacking as to the life of the property, the physical life of the depreciable assets, or as to the recoverable tonnage, and without these factors it is impossible to compute the proper allowance for depreciation. It follows, therefore, that we must approve the action of the Commissioner in disallowing the amount of depletion and depreciation claimed.

The fifth allegation of error relates to the net income of a partnership of which the petitioner was a member and to his distributive share of the net income of that partnership. These questions were disposed of in the decision mentioned in the findings of fact, and the net income of the partnership and the petitioner's distributive share thereof should be computed in accordance with that decision.

The sixth allegation of error relates to a deduction for 1920 in the amount to which it is alleged the petitioner is entitled by reason of net losses alleged to have been sustained in the operation of the mine in the years 1918 and 1919. The mere introduction of returns, to which in one instance the Commissioner's memorandum was attached, is not sufficient to establish a net loss, particularly where it is apparent that the Commissioner has made no effort to accurately compute the tax for such years, he having proceeded upon the theory that no tax was due, being satisfied as to such fact from the data disclosed on the return. It seems clear that the petitioner does have a net loss but we are wholly unable to ascertain the amount thereof, and accordingly deny the petitioner's claim therefor.

As to the issue raised by the seventh allegation of error, we must affirm the Commissioner for the reason that the March 1, 1913, value of the property and the allowable depreciation thereon have not been proven. Without these factors the computation can not be made.

The eighth allegation of error involves two questions: First the right to a deduction for an alleged bad debt, and second, the right to a deduction for an alleged loss of $800. After a careful consideration of all the evidence, we are unable to conclude that the petitioner's claim against his nephew was worthless. It is clear that the nephew was insolvent during the year in question, but in view

of all of the circumstances surrounding the creation of this obligation, we are not willing to regard a temporary insolvency as proof of worthlessness. The petitioner contends that he is entitled to deduct $800 as a loss sustained as the result of his transactions with the brokerage concern. We think that the loss was sustained, that petitioner's position in this regard is well taken, and that he is entitled to deduct the amount claimed in the year in question.

As to the affirmative allegations of the answer, the respondent offered no proof. A presumption of correctness attaches to his original action upon the two items involved and his present decision with reference thereto can not be said to do more than take away this presumption, and we accordingly conclude that the petitioner is entitled to these deductions as previously allowed by the Commissioner.

> *Judgment will be entered after 15 days' notice, under Rule 50.*

Considered by STERNHAGEN, ARUNDELL, and LANSDON.